IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION NO. 380 HEALTH & WELFARE FUND, et al., <br>        Plaintiffs, <br><br> v. <br><br> TRAVIS ELECTRIC, INC., <br>        Defendant. | Civ. No. 07-1649 |

**OPINION**

Pollak, J.                                       July 30, 2008

   Presently before the court is plaintiffs' motion for summary judgment (Docket No. 26). This motion is now ripe for disposition.

**I.  Background**

   Plaintiffs International Brotherhood of Electrical Workers Local Union No. 380 Health & Welfare Fund, International Brotherhood of Electrical Workers Local Union No. 380 Pension Fund, and International Brotherhood of Electrical Workers Local Union No. 380 Annuity Fund are all multiemployer welfare benefit plans associated with plaintiff International Brotherhood of Electrical Workers Local Union No. 380 (the "Union"), which is an unincorporated labor union. Plaintiff Thomas Burke is the plaintiff

funds' trustee. The plaintiff funds share a board of trustees, and that board serves as the collection agent for certain other union-affiliated funds, including the Local Joint Training and Apprenticeship Fund, the Eastern Pennsylvania Electrical Contractor Administrative Fund, as well as for collecting working dues required to be paid to the Union. Pl.'s Ex. 1, at 2 (declaration of Michael Ullman).

The Union serves as the collective bargaining agent for some of defendant Travis Electric's employees. Under the applicable collective bargaining agreement ("CBA"), defendant Travis is obligated to pay monthly contributions to the plaintiff funds, based on the gross wages paid by defendant to union workers. This dispute concerns whether defendant properly paid the plaintiff funds all of the money owed under the CBA.

Plaintiff alleges that defendant under-reported the contributions due on the wages paid to employee John Tomaselli between 2002 and 2007. During that time period, defendant paid Tomaselli a wage of $39.79 per hour for 32 hours of work each week. Pl.'s Ex. 23 (defendant's log of Tomaselli's weekly pay) & 24 (defendant's ledger card report reflecting Tomaselli's weekly pay). Travis acknowledges that Tomaselli was not required to report his hours, nor was it expected that he work exactly 32 hours per week. Def.'s Ex. 4, at 33, 44, 48 (deposition of Ryan Travis, defendant's operations manager). Rather, the agreement between Travis and Tomaselli was that, over the course of a year, his work average out to approximately 32 hours per week. *Id.* at 33. In addition, Travis paid Tomaselli an additional $463.36 each week. Pl.'s Ex. 23 & 24; *see also* Def.'s Ex. 4,

at 39–41, 44 (deposition of Ryan Travis); Def.'s Ex. 5, at 32 (deposition of Robert Travis). The nature of this portion of Tomaselli's pay is disputed; what is not disputed is that Travis did not include this amount in the gross wages figure used to calculate its contributions to the plaintiff funds.

This dispute, and, accordingly, the pending motion for summary judgment, center on the narrow question of whether contributions should have been paid on Tomaselli's additional monthly pay.[1]

## II.   Undisputed facts

Tomaselli began working for Travis as an electrician in 1988. He was referred to Travis from the union hall as a foreman. Def.'s Ex. 3, 11–13 (deposition of John Tomaselli). In 1998, Travis asked Tomaselli to open and manage a Travis office in Pennsylvania. *Id.* at 14. (Prior to that time, Travis's only offices were in New Jersey). Though Tomaselli was no longer performing traditional electrical work, but rather was acting as a manager, Travis and Tomaselli continued to treat Tomaselli's employment as a

---

[1] All of the various plaintiff funds are multi-employer welfare benefits plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1101, *et seq*. *See* Compl. ¶ 1; Answer ¶ 1. Plaintiff brings this suit under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to redress defendant's alleged violations of ERISA § 515, 29 U.S.C. § 1145, under which failing to make the required contributions to a multi-employer plan is a violation of ERISA.

Plaintiff has also sued for an audit and accounting, and for breach of contract. It appears, however, that plaintiffs have, since filing their complaint, been allowed to audit defendant, so the audit and accounting claims appear no longer in dispute. In addition, the breach of contract claim does not appear to be materially different from the ERISA claim, so the court will consider those claims together.

union job, inasmuch as Tomaselli did not withdraw from the union, *see* Pl.'s Ex. 14, at 4 (declaration of Kenneth MacDougall), and Travis continued to make some contributions to the union based to Tomaselli's pay, *see* Def.'s Ex. 3, at 19–20 (deposition of John Tomaselli), Def.'s Ex. 5, at 24–25 (deposition of Robert Travis).

In 2003, Tomaselli began having significant health problems, and he and Travis agreed to reduce his work hours. Specifically, Travis and Tomaselli agreed that Tomaselli would work approximately 1500 hours per year, or nearly 32 hours per week. Def.'s Ex. 3, at 22–24 (deposition of John Tomselli); Def.'s Ex. 4, 39–41 (deposition of Ryan Ttravis); Def.'s Ex. 5, at 27–29, 32 (deposition of Robert Travis). It was agreed that Travis would not keep track of Tomaselli's hours, but rather would pay him a fixed salary. Def.'s Ex. 3, at 22–24 (deposition of John Tomselli); Def.'s Ex. 4, 39–41 (deposition of Ryan Travis); Def.'s Ex. 5, at 27–29, 32 (deposition of Robert Travis). (Tomaselli did report his hours to the Union in accordance with its requirements, *see, e.g.*, Def.'s Ex. 1 & 2 (timesheets submitted by Tomaselli to the Union)). That salary was broken down into two components: each week he was paid $1,273.28, which translates to a rate of $39.79 for 32 hours of work, the approximate amount he was expected to work; in addition, he was paid $463.32. Pl.'s Ex. 23 & 24. Travis recorded this second amount as $57.92 per hour for eight hours of work, Pl.'s Ex. 23; *see also* Def.'s Ex. 4, at 40 (deposition of Ryan Travis), but Travis did not expect Tomaselli to perform any additional labor. Travis also recorded this sum as "management wages." Pl.'s Ex. 1, at 5

(declaration of Michael Ullman).

When Tomaselli reduced his weekly work hours to approximately 32 hours per week, Travis reduced its contributions to the plaintiff funds to an amount calculated on the basis of the $1,273.28 that Tomaselli was paid for his approximately 32 hours of work. Travis did not make any contributions on the basis of the additional $463.32 that Tomaselli was paid each week.

### III.   Liability

The central question in this case is whether the "management wages" that Tomaselli was paid should have been included in defendant's gross wages for the purpose of calculating defendant's required contributions to the plaintiff funds.

At the outset, it must be noted that the CBA uses a variety of terms to denote the figure on which contributions should be based. For the health and welfare fund, annuity fund, and pension fund, the term used is "gross monthly labor payroll." Pl.'s Ex. 4, at § 6.02–05 (relevant section of the CBA). For the apprenticeship fund, the term is "gross monthly payroll." *Id.* at § 5.16. For the administrative fund, the term is "gross labor payroll," *id.* at § 7.02, and for working dues it is "gross wages," Pl.'s Ex. 15, at § 7(a) (relevant section of the Union by-laws). There does not appear to be any dispute that these terms, though varied, are intended to refer to the same figure.

Defendant argues that the terms do not include Tomaselli's excess pay, that is, his pay above the amount strictly tied to the 32 hours per week he was generally expected to

work. Plaintiffs counter that the terms include all wage payments, no matter how they are named.

"Federal law governs the interpretation of a collective bargaining agreement." *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991). Though collective bargaining agreements differ from ordinary contracts in some respects, federal courts interpret them in accordance with general principles of state contract law, unless some principle of federal labor law commands a different interpretation. *Id.* Following general principles of contract law, the court must interpret the terms "gross monthly labor payroll," "gross monthly payroll," "gross labor payroll," and "gross wages" in accordance with their ordinary meaning. *See, e.g.*, *DL Res., Inc. v. FirstEnergy Solutions Corp.*, 506 F.3d 209, 217 (3d Cir. 2007) (Ohio law); *In re Montgomery Ward & Co.*, 428 F.3d 154, 162 (3d Cir. 2005) (Illinois law); *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3d Cir. 2004) (Delaware law). The Oxford English Dictionary defines "payroll" as "[a] sum of money constituting the total wage bill of an employer for a particular period" Oxford English Dictionary (2d ed. 1989). "Gross" is defined as "entire, total, whole." *Id.* Thus, the court believes that, in ordinary language, the term "gross payroll" (irrespective of whether it is adorned with the word "monthly," the word "labor," or both) in the context of the CBA refers to the total wages paid out to union workers.

This definition, however, does not entirely address the crux of defendant's

argument, which is that the excess money paid to Tomaselli each week was not a wage in the sense of payment for hours worked, but rather was "additional compensation paid as bonus, vacation time, or something else other than actual 'hours worked.'" Def.'s Resp., Docket No. 28, at 9. Robert Travis, a principal of defendant, specifically characterized the excess payment as a "bonus," Def.'s Ex. 5, at 32, as did Ryan Travis, the defendant's operations manager, Def.'s Ex. 4, at 44. According to defendant, the CBA is at least ambiguous as to whether bonus payments are different from ordinary wages, and thus not a part of gross payroll (or gross wages).

To decide whether a contract term is ambiguous, a court should consider the language of the contract, the meanings suggested by the parties, and the extrinsic evidence, including the structure and history of the contract, as well as the conduct of the parties. *In re New Valley Corp.*, 89 F.3d 143, 150 (3d Cir. 1996).

As stated, in the court's view, the plain meaning of "gross payroll" includes all sums regularly paid out to workers for their labor, no matter how those sums are characterized. The deal between Tomaselli and Travis, according to both Tomaselli and to Travis personnel, was that Tomaselli would, in return for his working approximately 32 hours per week, be paid a fixed amount each week. Def.'s Ex. 3, at 22–24 (deposition of John Tomselli); Def.'s Ex. 4, 39–41 (deposition of Ryan Travis); Def.'s Ex. 5, at 27–29, 32 (deposition of Robert Travis). Whether characterized as a salary, or as wages plus a weekly bonus, the end result was that Tomaselli received for his labor a pre-determined

amount of money every week.  This sum, in common parlance, was his gross weekly wage.[2]  Defendant's contention to the contrary would elevate form over substance.  According to defendant, whether a sum paid to an employee qualifies as a wage (and thus part of gross payroll) depends entirely on what the employer chooses to call the payment, and not at all on the manner, circumstances, or regularity of the payment.  It strikes the court as more than unlikely that the parties to the CBA intended that the meaning of seemingly comprehensive terms like "gross monthly labor payroll," "gross labor payroll," "gross monthly payroll," and "gross wages" should be susceptible to alteration to conform to an employer's semantic preferences.  Rather, the ordinary language conveys the sense that all sums regularly paid in return for labor were to be included.

Defendant, however, points to Article VII of the CBA, which is entitled "National Electric Industry Fund."  Def.'s Ex. 4, at § 7.01.  In that article, the CBA requires a contribution to the National Electric Industry Fund, and states the contribution as a percentage of "productive electrical payroll."  *Id*.  "Productive electrical payroll" is defined in a parenthetical as "the total wages including overtime paid with respect to all hours worked by all classes of electrical labor for which a rate is established in the prevailing labor area where the business is transacted."  *Id*.  To aid in collecting

---

[2] *See, e.g.*, Oxford English Dictionary (2d ed. 1989) (defining "wage" as "[t]he amount paid periodically, esp. by the day or week or month, for the labour or service of an employee, worker, or servant."); Black's Law Dictionary (8th ed. 2004) (defining "wages" as "[w]ages include every form of remuneration payable for a given period to an individual for personal services, including salaries, commissions, vacation pay, bonuses, and the reasonable value of board, lodging, payments in kind, tips, and any similar advantage received from the employer.").

contributions for all of the various funds provided for the in the CBA, the Union provided employers with remittance forms designed to be filled out each month by each employer to document their contributions. On those forms, the Union supplied a blank for a "productive electrical payroll" figure, from which *all* contributions, including contributions to the plaintiff funds, were to be calculated. This, according to defendant, suggests that the above-quoted definition for productive electrical payroll applies also to the terms "gross monthly labor payroll," "gross labor payroll," "gross monthly payroll," and "gross wages" since, according to the union-supplied remittance forms, those terms refer to the same monthly sum.

   Defendant urges the relevance of the "productive electrical payroll" definition because that definition refers specifically to "hours worked by . . . electrical labor." According to defendant, this definition excludes Tomaselli's additional $463.32 per week because it was not directly tied to Tomaselli's hours worked. Even accepting defendant's definition, the court finds this argument unpersuasive. The undisputed evidence shows that, in reality, none of Tomaselli's pay was tied directly to his hours worked. Rather, he was paid a fixed sum with the expectation that he would (a) spend the time necessary to keep the Pennsylvania office running properly, Def.'s Ex. 3, at 26 (deposition of John Tomaselli); Def.'s Ex. 4, at 35 (deposition of Ryan Travis), and (b) work, on average, something in the neighborhood of 32 hours per week, *see id.* at 33.[3] To whatever extent it

---

[3] To be clear, the 32-hour requirement, to whatever extent it can be said to have existed, was as loose as could be. In fact, defendant observes that, according to his timesheets, Tomaselli

can be said that Tomaselli's salary was tied to his working approximately 32 hours per week, the additional $463.32 was no less tied to those work hours than was the $1,273.28 it accompanied. Both sums were paid in a single paycheck each week that Tomaselli worked, so they were equally tied (or, in the court's view, not tied) to Tomaselli's work hours.

Defendant relies on two pieces of extrinsic evidence in arguing that Tomaselli's "management wages" should not be characterized as part of defendant's gross payroll.

First, defendant notes that plaintiffs voluntarily abandoned their claim for contributions on Tomaselli's vacation pay and annual bonus pay. In a letter to defense counsel, plainitffs' counsel stated that she was withdrawing plaintiffs' claims for contributions on those amounts. Def.'s Ex. 6. Her letter did not include any specific admissions of fact; rather, it simply withdrew two aspects of plaintiffs' damages claim. *Id*. From this withdrawal, defendant argues that plaintiffs have admitted that the CBA does not require contributions on vacation pay and annual bonuses. But parties voluntarily abandon aspects of their claims for a variety of reasons. It would be inappropriate for the court to read an admission into plaintiffs' counsel's letter where none exists. Moreover, this remaining claim concerns a so-called weekly bonus, that is, an amount paid every week. Even if plaintiffs had admitted that they were not entitled to

---

averaged fewer than 32 hours per week. *See* Def.'s Ex. 1 & 2. Nothing on record suggests that defendant was in any way chagrined by Tomaselli's hours worked; on the contrary, Ryan Travis testified that Tomselli was evaluated solely on his performance, Def.'s Ex. 4, at 35, and Tomaselli and defendant continued their arrangement until Tomaselli's retirement in 2007.

contributions based on amounts paid as vacation time or as annual bonuses, it is not clear that a so-called weekly bonus would be treated the same way.

Second, defendant relies on a document referred to by defendant as the "Funds' Restated Employee Benefit Agreement and Trust for National Electrical Benefit Fund." Def.'s Ex. 7. Unfortunately, defendant only submitted one poorly copied page of the document, not including a cover page, so the court has no means of discerning just what this document is or how it fits into this litigation. The page submitted by defendant appears to regulate contributions to the National Electric Benefit Fund, one of the funds provided for by Article VI of the CBA, *see* Pl.'s Ex. 4, at § 6.01, but not one of the funds that is a party to this action or a fund on whose behalf plaintiffs are seeking to collect fees. In any event, the submitted page defines "gross labor payroll" generally as "all wages and other compensation paid to or accrued by" a union employee. It goes on to provide that the term "wages and other compensation" does not include:

> the value of non-cash fringe benefits; bona fide contributions made by the [employer] to (a) a trust fund establih[ed] under § 302(c) of the Taft-Hartley Act; or (b) a separate entity or fund which proivides retirement benefits or medical benefits; and bona fide bonuses of an extraordinary nature (i.e. lump sum year-end bonuses, not ordinarily paid as part of a regular payroll period).

Def.'s Ex. 7, § 6.23. Even if the court were to view this document as relevant (which is hardly a given since the fund at issue is not a party to this lawsuit), it would only confirm the court's prior analysis. In the text quoted above, a distinction is made between regular

pay and "bonuses[] *not* ordinarily paid as part of a regular pay period." *Id.* (emphasis added). Here, even if Tomaselli's excess pay can be characterized as a bonus, it cannot be characterized as a "bona fide bonus[] of an extraordinary nature" or as a bonus "not ordinarily paid as part of a regular payroll period." On the contrary, it is not disputed that Tomaselli's excess compensation was paid out every week as part of Tomaselli's regular paycheck. So even if the plan document submitted by defendant governed, or were deemed instructive, it would only bolster plaintiffs' case.

In addition to its main argument, defendant references two other arguments without fully briefing them. For completeness' sake, the court will address them both.

Defendant argues that Tomaselli was not, during this period, performing the work of an IBEW foreman, but rather was acting as a manager.[4] Defendant does not explain the legal consequence of this argument, so it is difficult for the court to know what to do with it. Perhaps more importantly, defendant's personnel concede that defendant treated Tomaselli as a union employee in order to allow him to maintain his union membership and his union benefits. Def.'s Ex. 5, at 24–25 (deposition of Robert Travis); Pl.'s Ex. 21, at 46 (deposition of Peter Barba). Defendant cannot have it both ways: Tomaselli either was a union employee governed by the CBA, or he was not. Here, defendant admits that it

---

[4] Defendant further observes that, discounting the additional $463.32 per week, Tomaselli was already being paid at a rate higher than that provided for by the CBA. The court fails to see how this fact could be of consequence. The CBA expressly provides for *minimum* wage rates. Pl.'s Ex. 4, at § 3.05. Nothing prevents an employer from paying a particular union employee more than the established rate.

treated Tomaselli as a union employee, so it cannot now argue that Tomaselli's work was not actually covered by the CBA. What work Tomaselli may have been performing is of scant consequence at this stage.[5]

Second, defendant, in a footnote, suggests that this matter should be referred for arbitration in accordance with the grievance procedures outlined in the CBA. *See* Pl.'s Ex. 4, at § 1.05–09. Defendant's presentation of this argument is, to say the least, underwhelming. Whether a dispute is subject to mandatory arbitration is a question of too much consequence to be relegated to a one-sentence footnote in an opposition to a motion for summary judgment. Section 3 of the Federal Arbitration Act is instructive:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall *on application of one of the parties* stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

---

[5] In their depositions, Robert Travis and Peter Barba, an executive of defendant, seemed to believe that their arrangement with Tomaselli was merely a means of allowing him to maintain his union benefits, but was something short of full-scale recognition of Tomaselli as a union employee. Def.'s Ex. 5, at 24–25 (deposition of Robert Travis); Pl.'s Ex. 21, at 46 (deposition of Peter Barba). This is nonsense. Tomaselli was referred to defendant through the union hall as a union worker in 1998 and worked for defendant continuously from that time through the time period at issue in this suit. Def.'s Ex. 3, at 13 (deposition of John Tomaselli). At no time did he withdraw from the union. Pl.'s Ex. 14, at 4 (declaration of Kenneth MacDougall). The CBA does not, in any section identified by defendant, provide for any sort of hybrid status. Thus, by (1) hiring Tomaselli though a union hall referral, (2) paying union contributions on Tomaselli's salary, and (3) allowing Tomaselli maintain his status as a union employee, defendant remained bound by the CBA to make contributions based on Tomaselli's gross wages.

9 U.S.C. § 3 (emphasis added). Parties desiring an order compelling arbitration must make application to the court for such an order. The manner of this application should, in accordance with Rule 7(b) of the Federal Rules of Civil Procedure, be a formal motion. Such a motion should, in accordance with Local Rule 7.1(c), be accompanied by a memorandum explaining the grounds for the party's request. Here, rather than following these basic rules for requesting action from a federal district court, defendant has styled its request for relief as an alternative argument (that is, alternative to its main argument, which appears in the text of its opposition papers, that summary judgment is inappropriate on the merits) and tucked it into a footnote.

      The court will deny defendant's alternative request for arbitration for three reasons.

      First, the request is not made in the form of a motion, as Rule 7(b) requires, nor it is briefed, as Local Rule 7.1(c) requires. Few rules of civil procedure are as easy to follow as Rule 7(b) and Local Rule 7.1(c). All these rules require is a formal motion and a statement of grounds. If defendant cannot be bothered to submit a formal motion and a statement of grounds, then it cannot be serious about the relief it purports to desire. Moreover, the court could not easily rule on defendant's request, as the court has not been provided a complete copy of the arbitration portion of the CBA. The copy submitted by plaintiffs does not include anything following the third line of § 1.09, which makes sense given that this section has nothing to do with plaintiffs' argument. Defendant, however,

has not submitted a complete copy to accompany its footnote request, nor has it made any argument as to how the grievance procedure works or how it applies. Without providing a complete copy of the arbitration agreement and some explanation of why defendant believes it applies here, the court cannot find that defendant has adequately demonstrated that this dispute is subject to arbitration.

Second, defendant has waived any right to arbitration by not raising the issue in motions practice before now. Although waiver by delay is not favored, the Third Circuit has held that the right to arbitration is waived when defendant's delay causes prejudice. *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d at 912, 926–27 (3d Cir. 1992). Here, defendant has, without a peep, submitted to full discovery in this matter. Discovery is now complete, and the case, having been pending for more than a year, is ready for disposition, either by summary judgment or by trial. Plaintiffs have doubtless spent substantial time, effort, and expense in getting this case ready for summary judgment practice and trial. The sheer number of exhibits and depositions submitted attests to plaintiffs' efforts, which, particularly considering that this is not a high-dollar-value case, are significant. Moreover, the arbitration procedure outlined in those portions of the CBA available to the court do not appear to contemplate discovery. Thus, having accepted the benefit of discovery from plaintiffs, and having put plaintiffs to the expense of discovery, defendant should not now be allowed to stay these proceedings and access an arbitral forum. *See id.* at 926. The court acknowledges that it appears that defendant raised the

issue of arbitration in its answer, and that there has not been, before now, any other substantial formal motions practice[6] (aside from the motions practice associated with vacating defendant's default), *id.* at 927; nevertheless, the court believes that, for the reasons just discussed, submitting this case to arbitration at this late stage would cause plaintiff prejudice, and should not be allowed.

Third, defendant's alternative request for an order compelling arbitration bears a striking resemblance to forum shopping. The thrust of its opposition to plaintiff's motion for summary judgment is that this court should deny plaintiff's motion on the merits. But, just in case the court disagrees, it attempts to preserve an argument for arbitration in a footnote. This form of argument is not attractive, nor is it persuasive.

\* \* \* \* \*

In essence, defendant structured a means of paying plaintiffs just enough to maintain Tomaselli's union status, without being saddled with contributions on his entire salary. There is nothing wrong with such a scheme in the abstract, but, unfortunately for defendant, the CBA contemplates no such arrangement. Rather, it stipulates that contributions to the plaintiff funds are assessed based on union employees' *gross* wages, not some portion thereof.

The court, having examined defendant's evidence, cannot find any ambiguity in

---

[6] It should be noted, however, that the parties did meet regularly with Magistrate Judge Angell for status conferences throughout the discovery process. The court is not aware of the content of those conversations, but it is the case that Judge Angell discourages formal discovery motions, so any disputes were likely handled informally in status conferences.

the terms "gross monthly labor payroll," "gross labor payroll," "gross monthly payroll," or "gross wages." Rather, the text and structure of the CBA, as well as all of the extrinsic evidence line up in favor of plaintiffs' understanding that gross payroll simply means the amount of money regularly paid out as compensation for covered employees' labor, whether labeled as wages, salary, "management wages," weekly bonus, or otherwise. It is clear from the undisputed evidence that the "management wages" paid to Tomaselli were part of his regular weekly pay, and thus should have been included in defendant's calculation of its gross payroll. Because those wages were not included, defendant, in violation of ERISA § 515, 29 U.S.C. § 1145, failed to make the contributions to the plaintiff funds as required by the CBA. Accordingly, plaintiffs are entitled to summary judgment on the question of defendant's liability.

## IV.   Remedy

The court is not convinced that plaintiffs have carried their burden of demonstrating that there are no material facts in dispute with regard to damages. In particular, the court notes that plaintiffs have not provided a full explanation for how they arrived at the various sums they demand, nor have they submitted an affidavit from the accountant responsible for the calculations. Therefore, the court will deny plaintiffs' motion for summary judgment on the question of damages and will conduct an evidentiary hearing to fix the amount of damages. Neither side has lodged a jury demand, so the court assumes that neither side disputes the propriety of a non-jury damages

proceeding.

In advance of the damages hearing, the parties are strongly urged to consider settlement, and, failing that, to attempt to reach agreement on the proper remedy in light of the court's decision on liability.  The court will refer this case back to Judge Angell for purposes of conducting a settlement conference.  Should the parties be unable to reach agreement on either (a) a settlement, or (b) an amount of damages appropriate in light of the court's order, a damages hearing will be scheduled.

An appropriate order will follow.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION NO. 380 HEALTH & WELFARE FUND, et al., <br><br>                    Plaintiffs, <br><br> v. <br><br> TRAVIS ELECTRIC, INC., <br><br>                    Defendant. | Civ. No. 07-1649 |

**ORDER**

AND NOW, this 30th day of July, 2008, for the reasons in the foregoing opinion, it is hereby ORDERED that:

1. Plaintiffs' motion for summary judgment (Docket No. 26) is GRANTED in part, and DENIED in part;

2. This matter is REFERRED to Magistrate Judge M. Faith Angell for a settlement conference;

3. Should an attempt at settlement fail, the parties are ORDERED to inform the court so that a damages hearing can be scheduled.

BY THE COURT:

/s/ Louis H. Pollak

_____
Pollak, J.